# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

DAWN WILSON,

        Plaintiff,

    v.                                            Case No. 04-CV-233

TECSTAR MFG. COMPANY,

        Defendant.

_____

**ORDER**

On March 8, 2004, the plaintiff, Dawn Wilson ("Wilson"), filed her complaint in this action alleging that she was discriminated against by her employer, TecStar Mfg. Company ("TecStar"), on the basis of her race, African-American. Wilson asserts that TecStar discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981 by assigning additional responsibilities to a Caucasian employee instead of Wilson. Wilson also asserts that TecStar retaliated against her for filing a discrimination complaint against it by creating more onerous working conditions for her, unfairly applying TecStar's attendance policy to her, and ultimately terminating her for attendance policy violations. On August 1, 2006, TecStar filed a motion for summary judgment asserting that the undisputed facts demonstrate that it did not discriminate or retaliate against Wilson and that its decision to terminate Wilson was based on Wilson's poor attendance record. For the reasons stated below, the court will grant the defendant's motion for summary judgment.

## BACKGROUND

The material facts of the case are not in dispute. TecStar, a manufacturing facility in Germantown, Wisconsin, hired Wilson as a machine operator in September 1999. As a machine operator in TecStar's manufacturing operations, Wilson packaged products, notified supervisors of defects in products, and performed other manufacturing related tasks. Each shift of workers on TecStar's manufacturing lines was similarly organized with a shift supervisor and lead operator. In August 2002, Mark Streator ("Streator") was the shift supervisor primarily responsible for supervising the machine operators, including Wilson, and Ceil Waala ("Waala") was the lead operator who assisted Streator in overseeing the operations. One machine operator was assigned additional duties as a backup to the lead operator. The backup to the lead operator was not a separate position or separate job classification within TecStar, however the backup to the lead operator was assigned additional job responsibilities including getting parts, checking to see if parts were in the warehouse, observing when a run order was completed, training new employees, and taking over for the lead operator if the lead operator was absent from work. Machine operators assigned backup duties were not awarded an increase in pay or benefits.

In August 2002, Shirley Bartelt ("Bartelt"), a machine operator, was performing the duties of backup to the lead operator. At that time, Bartelt was moving to a different department and would not be available to continue performing the backup duties. The shift supervisor, Streator, and the lead operator, Waala, did not select Wilson to replace Bartelt as backup to the lead operator, and Wilson never applied for the role, however, Bartelt selected Wilson to replace her as backup to the lead operator. Bartelt

trained Wilson to perform the backup duties for 1 or 2 days, however, on August 27, 2002, Wilson was informed that she would no longer be trained to perform the backup duties. Instead, Anna Brown ("Brown"), a Caucasian machine operator hired in the same month as Wilson, was assigned the backup duties. Wilson states that it took only a few days for her to be trained to perform the backup duties, however it took Brown over a month to be trained in those duties. Wilson also states that she had more experience than Brown at the time Brown replaced her, however, it is undisputed that Brown had been previously performing backup and training duties when she worked on the molding floor at TecStar, and like Wilson, Brown had several years of manufacturing experience at a previous employer. It is also undisputed that Brown was never compensated at a higher rate or promoted because she performed these extra duties.

TecStar's written attendance policy calls for escalating warnings and discipline for attendance violations. Between August 2002 and May 2003, Wilson missed at least 15 days of work at TecStar. During this time, TecStar provided Wilson with a verbal warning on September 25, 2002, a written warning on November 12, 2002, and a 3-day suspension from employment from April 9 to April 11, 2003. Wilson claims, however, that the attendance policy was unfairly applied to her. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶¶ 45-64.) Following the suspension, Wilson again missed work on May 21, 22, 27, and 28, 2003. Following these absences, TecStar terminated Wilson effective May 24, 2003. From September 1999 to May 2005, TecStar also terminated 8 other machine operators for violations of TecStar's attendance policy. (MacDonald Aff. Ex. G.)

In September 2002, Wilson filed a charge of race discrimination with the Equal Rights Division of the Wisconsin Department of Workforce Development ("ERD") and with the United States Equal Employment Opportunity Commission ("EEOC"). In her complaint, Wilson claimed that she was "improperly, wrongfully demoted by Mr. Mark Streator," and that she was better qualified than Brown for the position of backup to the lead operator. (Carrig Aff. Ex. F.) On December 8, 2003, the EEOC issued Wilson a notice of right to sue on this charge. In September 2003, Wilson filed a charge of retaliation with the ERD and the EEOC. Wilson was issued a notice of right to sue on this charge by the EEOC on January 12, 2004, and Wilson filed her complaint in this action on March 8, 2004.

## ANALYSIS

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable and justifiable inferences in favor of that party. *See id.* at 255. Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party opposing

summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

As noted above, Wilson's complaint raises claims of discrimination and retaliation under Title VII and § 1981. Wilson alleges that TecStar intentionally discriminated against her by not assigning her the backup to the lead operator's responsibilities even though she was better qualified than Brown to assume those responsibilities. Wilson also alleges that TecStar retaliated against her for filing the charge of discrimination with the ERD and the EEOC by creating more onerous working conditions for her, unfairly applying TecStar's attendance policy to her, and ultimately terminating her for attendance policy violations.

A plaintiff alleging race discrimination under Title VII and § 1981 can prove his or her case by using the direct or indirect method of proof. *See Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). If a plaintiff proceeds under the direct method, he or she may rely on either direct evidence or circumstantial evidence. *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005). Direct evidence is what the employer said or did. "Direct evidence essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Intentional discrimination may also be established by a plaintiff who establishes a "convincing mosaic" of circumstantial evidence. *Troupe v. May Dept. Stores*, 20 F.3d 734, 737 (7th Cir. 1994). There are three types of circumstantial evidence: suspicious statements or behavior, other employees receiving systematically better treatment (comparative), and

a qualified plaintiff was passed over by someone else without plaintiff's characteristic and the employer's reason for the difference is unworthy of belief (pretextual). *Id.* at 736. In the instant case, Wilson attempts to prove intentional race discrimination by using the indirect method of proof.

Because Wilson presents no direct evidence of discrimination, Wilson's discrimination claim will be analyzed under the *McDonnell Douglas* burden shifting approach. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In order to survive summary judgment under the burden shifting method, Wilson must first establish a prima facie claim by showing that: (1) she belongs to a protected class; (2) her performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly-situated others not in the protected class received more favorable treatment. *See Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1034 (7th Cir. 2004). If Wilson establishes a prima facie claim, the burden shifts to TecStar who may then articulate a legitimate business reason that justified the action it took. *See McDonnell Douglas*, 411 U.S. at 802-03. Once such a reason is presented, the plaintiff must establish by a preponderance of the evidence that the employer's stated reason is merely a pretext for discrimination or retaliation. *See Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001).

It is undisputed that Wilson, as an African-American, is a member of a protected class. For purposes of Wilson's discrimination claims, TecStar also does not dispute that Wilson was meeting TecStar's expectations. TecStar asserts, however, that Wilson did not suffer an adverse employment action. TecStar claims that the employer action Wilson complains of did not constitute an adverse employment action because

the assignment of the backup duties to Brown did not create a material change in Wilson's job.

In *Traylor v. Brown*, 295 F.3d 783 (7th Cir. 2002), the Seventh Circuit defined an adverse employment action as:

> more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. . . . Of course, not everything that makes an employee unhappy will suffice to meet the adverse action requirement. . . . Rather, an employee must show that material harm has resulted from the challenged actions.

*Id.* at 788 (citations omitted).

TecStar asserts that the extra responsibilities associated with being a backup to the lead operator did not create a material difference in the terms of employment for the machine operator assigned those duties. TecStar notes that the assignment of the backup duties did not effect an employee's pay, benefits, title, or authority. (MacDonald Aff. ¶ 4.) Additionally, TecStar notes that Wilson received training from Bartelt on the additional backup duties for only 1 or 2 days before she returned to her regular duties, and Wilson suffered no change in her pay or benefits. TecStar also states that employees assigned the backup duties did not receive enhanced career prospects. TecStar's director of human resources, Monica MacDonald ("MacDonald"), states that TecStar did not have a history of promoting operators assigned the backup duties and she was not aware of any instance where the operator assigned the backup duties was promoted to lead operator. (MacDonald Aff. ¶ 16.)

In her response to TecStar's motion for summary judgment, Wilson contends that there is sufficient evidence to establish that she suffered an adverse employment action by being demoted from her position as backup to the lead operator. Wilson claims that the additional training and experience provided by the backup to the lead position was valuable to employees at TecStar and that the experience could lead to a promotion. In support of this position, Wilson points to deposition testimony of Brown and Bartelt. Brown stated in her deposition that her performance of the backup duties would help her "advance within TecStar." (Brown Dep. 38-39.) And in response to the question: "Did you think that maybe taking on those extra [backup] duties would help in your career path at TecStar, maybe?" Bartelt stated "Yes." (Bartelt Dep. 7.)

In *Bryson v. Chicago State Univ.*, 96 F.3d 912 (7th Cir. 1996), the Seventh Circuit noted that depriving someone of the building blocks for a promotion is just as serious as depriving the person of the job itself. *Id.* at 917. However, speculation that the plaintiff's opportunities for promotion are negatively effected is insufficient to defeat summary judgment. *O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004).

Here, Wilson presents no objective evidence that performing the additional backup duties would make an employee more likely to be promoted. Indeed, Wilson does not point to any TecStar employee who was promoted after performing the backup duties. Furthermore, TecStar's director of human resources, MacDonald, states that TecStar did not have a history of promoting operators assigned the backup duties and she was not aware of any instance where the operator assigned the backup duties was promoted to lead operator. (MacDonald Aff. ¶ 16.) In short, Wilson's subjective opinion and Brown's and Bartelt's speculation that performing the additional

backup duties could have improved one's career prospects is insufficient to defeat summary judgment. *See O'Neal*, 392 F.3d at 912.

Wilson asserts she was "demoted" from the position of backup to the lead operator after she had been trained in the position for 1 or 2 days, however, there is no official position or job classification of backup to the lead operator within TecStar. (MacDonald Aff. ¶ 4.) Instead, the record demonstrates that the reassignment of the backup duties from Wilson to Brown was not a demotion; rather, it was simply a matter of assigning the additional responsibilities to Brown, a machine operator who had performed similar responsibilities in another department within TecStar. The terms and conditions of Wilson's employment (or for that matter Brown's) were not materially effected by the assignment or reassignment of the backup duties. Specifically, Wilson performed the backup duties for only 1 or 2 days before returning to her regular duties and she suffered no change in her pay, benefits, title, or authority. Additionally, Wilson presents no objective evidence that machine operators performing backup duties were more likely to be promoted than machine operators not performing those duties. Furthermore, Wilson was not selected to perform the backup duties by her shift supervisor, Streator, or the lead operator, Waala; rather, Bartelt, a fellow machine operator without the authority to promote operators, selected Wilson to perform the backup duties even though Wilson never applied for the role. (MacDonald Aff. ¶ 15.)

The *Traylor* court held that an adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Traylor,* 295 F.3d at 788. Here, the removal of the backup duties which were improperly assigned to Wilson for 1 or 2 days, did not significantly diminish Wilson's material responsibilities,

or constitute a material change in the terms of Wilson's employment. Given that Wilson has not established that she suffered an adverse employment action, she has not established a prima facie case of race discrimination based on TecStar's decision to not assign her the backup duties.

Even if Wilson had established a prima facie case of discrimination, Wilson does not establish by a preponderance of the evidence that the reasons provided by TecStar for offering the backup duties to Brown are a pretext for discrimination. In *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002), the Seventh Circuit held:

> where an employer's proffered nondiscriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.

*Id.* at 1180 (internal quotations omitted).

Here, Wilson states that Bartelt, the machine operator who had been performing the backup duties, selected Wilson to perform the backup duties because Wilson knew all the jobs as well as Bartelt, Wilson was there every day, Wilson was versatile because she had cross-trained within TecStar, and Wilson did not need more than a few days of training. Wilson also asserts that she was better qualified than Brown to assume the backup duties because Brown "hardly ever worked in Assembly" and "did not know the positions like Dawn [Wilson] did by far." (PPFOF ¶ 17.) Although Bartelt may have felt that Wilson was well qualified to perform the backup duties, Bartelt did not have authority to assign those duties to Wilson. (MacDonald Aff. ¶ 15.) Furthermore, the differences between Wilson and Brown, who were hired by TecStar

in the same month, are not so favorable to Wilson that there can be no dispute among reasonable persons of impartial judgment that Wilson was "clearly better qualified" than Brown to perform the backup duties. *See Millbrook*, 280 F.3d at 1180. Indeed, a review of the employment histories of Brown and Wilson reveals that Brown, unlike Wilson, had previous experience in performing backup and training responsibilities when she worked on the molding floor at TecStar, and Brown gained over 2 more years of manufacturing experience than Wilson when she worked for a previous employer. (Brown Dep. 6-7, 30-31; MacDonald Supplemental Aff. Exs. A and B.) Accordingly, based upon Brown's relevant work experience within TecStar and her additional experience at a previous employer, the record suggests that TecStar reasonably concluded that Brown was better qualified than Wilson to perform the backup duties.

Wilson also claims that TecStar retaliated against her in violation of Title VII after she filed the charge of discrimination with the ERD and the EEOC by creating more onerous working conditions for her, unfairly applying TecStar's attendance policy to her, and ultimately terminating her for attendance policy violations. Title VII prohibits, among other things, an employer from discriminating "against any of [its] employees . . . because [they] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff has two routes to establish a Title VII retaliation claim. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). One is to present direct evidence, or "evidence that establishes without resort to inferences from circumstantial evidence," that the plaintiff engaged in protected activity and as a result suffered the adverse employment action of which the plaintiff complains. *Id.* In the

second route, an adaptation of the *McDonnell Douglas* burden shifting method, a plaintiff must demonstrate that after the plaintiff engaged in a statutorily protected activity, the plaintiff was treated less favorably than other similarly situated employees who did not engage in the protected activity, even though the plaintiff was performing his or her job in a satisfactory manner. *Id.*; *see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

Wilson's filing of the charge of discrimination with the ERD and the EEOC in September 2002 constitutes a protected expression. Thus, in order to establish a Title VII retaliation claim, Wilson must demonstrate that after she filed the charge of discrimination, she was treated less favorably than other similarly situated TecStar employees who did not file a charge of discrimination, even though she was performing her job in a satisfactory manner.

Wilson claims that after she filed the charge of discrimination, Streator retaliated against her by making her work conditions more onerous. Specifically, Wilson asserts that Streator regularly isolated her from other employees, began to "single out" Wilson and treat her differently than the other employees, subjected her to increased scrutiny, assigned her less desirable jobs, refused to notify her of opportunities to work overtime, disciplined her once for talking even though others were also talking, humiliated her in front of other employees by ordering her to sit down, and warned employees about excessive use of the bathroom after Wilson informed him that she had a health problem that required her to use the bathroom frequently. (Pl.'s Resp. Br. 15-16.)

While Wilson may have felt that she was subjected to more onerous working conditions after she filed the charge of discrimination, she has not demonstrated that

-12-

Case 2:04-cv-00233-JPS   Filed 01/23/07   Page 12 of 20   Document 50

she was treated less favorably than other similarly situated TecStar employees who did not file a charge of discrimination. Specifically, Wilson does not state what types of less desirable jobs she was assigned or why they were less desirable. And, other than the two occasions, one where she was disciplined for talking while others were also talking and another where she was ordered to sit down, she does not describe how she was singled out or treated differently than other TecStar employees. Additionally, Streator warned all employees about excessive use of the bathroom, not just Wilson.

Furthermore, the record does not support Wilson's claim that Streator denied her opportunities to work overtime. Although Wilson claims she regularly worked overtime before she filed the charge of discrimination, the only evidence that supports this claim is her own vague testimony that "Prior to filing, I worked overtime. Quite a bit, depending on when they had it." (PPFOF ¶ 35; Wilson Dep. 54.) Additionally, the court cannot reasonably infer that Wilson was denied opportunities to work overtime when Wilson's undisputed overtime records reveal that there was no substantial change in the amount of overtime she worked after she filed the charge of discrimination. Specifically, Wilson worked overtime on 3 occasions in the 8 months before she filed the charge of discrimination, and she worked overtime once in the 9 months after she filed the charge of discrimination. (MacDonald Supplemental Aff. ¶ 2.)

Finally, in regards to Wilson's claim of increased scrutiny, Brown testified at her deposition that Streator "watched everybody" (Brown Dep. 26), and increased scrutiny by a supervisor does not rise to the level of an adverse employment action. *See, e.g., Harris v. Firstar Bank Milwaukee, N.A.*, 97 Fed. Appx. 662, 665 (7th Cir. 2004).

Although the alleged conduct may have been distressing to Wilson, none of the alleged conduct affected Wilson's pay, benefits, or the material terms and conditions of her employment. In sum, Wilson has not demonstrated that other similarly situated TecStar employees who did not file a charge of discrimination were granted more opportunities to work overtime, or were not subjected to similar working conditions. Accordingly, Wilson has not demonstrated that she was treated less favorably than other similarly situated TecStar employees who did not file a charge of discrimination.

Wilson also claims that she was subjected to racially discriminatory attendance policies in retaliation for filing the charge of discrimination. Under TecStar's attendance policy, an employee is assessed an unexcused absence if the employee returns to work and fails to immediately produce a doctor's note. (MacDonald Aff. Ex. A; MacDonald Dep. 39-40; MacDonald Supplemental Aff. ¶ 4.) As TecStar's director of human resources, MacDonald was primarily responsible for implementing the attendance policy. Wilson asserts that TecStar assessed her unwarranted unexcused absences that ultimately led to her termination. Specifically, Wilson states that on or about October 15, 2002, she was assigned an unexcused absence even though she brought in a doctor's note. (PPFOF ¶ 45.) Additionally, when Wilson was absent from work on November 11, 2002, she brought a doctor's note to work on November 13, 2002, the day after she returned to work, however TecStar refused to accept the note and issued her a written warning. Wilson states that she could not have brought in the doctor's note until November 13th because she worked third shift on the 12th (into the early morning hours of the 13th).

Wilson claims that similarly situated TecStar employees who did not file a charge of discrimination were not penalized for failing to bring in doctor's notes on the day they returned to work. For example, Wilson states that Brown never had to bring in a doctor's note if she was sick just one day. (PPFOF ¶ 49.) Wilson also states that in May 2002, Jessica Labiszak ("Labiszak") brought in a doctor's note two days after she returned to work and MacDonald changed her absence from unexcused to excused. Wilson also states that in December 2002, Laurie Malone ("Malone") brought in a doctor's note four days after she returned to work and MacDonald changed her absence from unexcused to excused. Wilson also states that in November 2002, MacDonald offered to let Robin Knoble ("Knoble") bring in a doctor's note the day after she returned to work and excused her absence. Finally, Wilson states that Kristine Uhlenkamp ("Uhlenkamp") came in late to work 3 to 4 times per week but was not assessed unexcused absences or tardiness, only verbal warnings.

TecStar contends that the examples provided by Wilson of discriminatory application of its attendance policy are incorrect. For example, although Wilson states that she was assigned an unexcused absence on October 15, 2002, even though she brought in a doctor's note, the attendance report indicates that she was assigned an excused absence that was of no consequence. (Wilson Dep. Ex. 17.) Additionally, TecStar notes that although Wilson claims she could not have brought in a doctor's note for her absence on November 11, 2002, until November 13th because she worked third shift on the 12th, Wilson did not explain why she could not get the doctor's note when she had all day on the 11th to get it. TecStar also contends that Wilson's claim that Brown never had to bring in a doctor's note if she was sick just one day is

-15-

incorrect. Indeed, TecStar's employment records show that Brown was assessed an unexcused absence on 6 occasions for not providing a doctor's note on the days she returned to work, and Brown was ultimately terminated on September 26, 2003, for violating TecStar's attendance policy. (MacDonald Aff. Ex. G; MacDonald Supplemental Aff. Ex. C.)

TecStar also states that the other examples provided by Wilson are incorrect as well. Specifically, Labiszak was not late in bringing in a doctor's note in May 2002; rather, she brought it in on the day she returned to work, as her supervisor confirmed, but it was temporarily misplaced in the intra-office mail system. (MacDonald Supplemental Aff. ¶ 3.) Additionally, Malone was not late in bringing in a doctor's note in December 2002. Malone was absent on December 26, 2002, and she brought in a doctor's note when she returned to work on her next scheduled day of work, December 30, 2002. (*Id.*) And the reason MacDonald accepted a doctor's note from Knoble the day after she returned to work in November 2002 was because Knoble actually brought the note in on the day she returned to work, however, her supervisor was absent and the fill-in supervisor did not know that he was supposed to forward the note to MacDonald. (*Id.*) Finally, Uhlenkamp was terminated on March 27, 2003, for violating TecStar's attendance policy. (MacDonald Aff. Ex. G.) TecStar asserts that these explanations demonstrate that TecStar applied its attendance policy in a uniform manner.

Wilson also claims that Streator and MacDonald treated her more harshly with respect to her vacation requests than they treated other similarly situated TecStar employees who did not file a charge of discrimination. In early April 2003, Wilson made

a mistake in her vacation request. She requested to take a vacation day on April 1, 2003, but she actually needed to take a vacation day on April 2, 2003. Wilson spoke to the lead operator and left a message for MacDonald to correct the mistake and the lead operator told Wilson she would handle it. However, Wilson was assessed an excused absence for April 1, 2003, despite working all day, and she was assessed an unexcused absence for April 2, 2003, when she took a vacation day. Streator assessed Wilson a 3-day suspension for these absences.

To accommodate scheduling needs, TecStar requires 2 weeks notice for vacation requests, and if an employee submits a corrected vacation request more than 2 weeks in advance, it was generally no problem to change the vacation dates. (MacDonald Dep. 47-48.) However, if a corrected vacation request is submitted with less than 2 weeks advance notice, the employee could still take the time off, but the employee would be assessed unexcused absences. (*Id.*) TecStar contends that Wilson was assessed the unexcused absence for April 2, 2003, in accordance with its attendance policy, because she submitted her corrected vacation request with less than 2 weeks advance notice. TecStar also notes that although Wilson asserts that other TecStar employees made mistakes on their vacation requests and that the lead operator fixed those mistakes for them, Wilson provides no evidence other than her own testimony to support these claims, and none of the evidence suggests that the other employees submitted requests to correct the dates with less than 2 weeks advance notice.

Although Wilson claims that the unexcused absences assessed to her attendance record described above were baseless, and as such, TecStar had no

grounds to terminate her, Wilson has failed to demonstrate that TecStar applied its vacation or attendance policy more harshly to her than to other similarly situated TecStar employees who did not file a charge of discrimination, that she was performing her job in a satisfactory manner, or that the reason TecStar provided for her termination was a pretext. It is undisputed that in the 9-month period between September 2002 and May 2003, Wilson missed at least 15 days of work at TecStar, with at least 10 excused absences and at least 5 unexcused absences. (Wilson Dep. 82-83, Exs. 15-37.) Due to excessive absences, TecStar provided Wilson with a verbal warning on September 25, 2002, a written warning on November 12, 2002, and a 3-day suspension from employment from April 9 to April 11, 2003. (MacDonald Aff. ¶¶ 7-9, Exs. C, D, E.) Following the suspension, Wilson again missed work on May 21, 22, 27, and 28, 2003. (MacDonald Aff. ¶ 11.) Following these unexcused absences, TecStar terminated Wilson effective May 24, 2003. (MacDonald Aff. ¶ 11, Ex. F.)

Viewing the facts in the light most favorable to Wilson, Wilson has not established that TecStar retaliated against her in violation of Title VII. Specifically, Wilson has not shown that she was subjected to more onerous working conditions or subjected to racially discriminatory attendance policies that ultimately lead to her termination after she filed the discrimination complaint. Indeed, the record does not suggest that any of the alleged retaliatory acts were motivated by Wilson's filing of her complaint. Rather, the record demonstrates that TecStar does not tolerate violations of its attendance policy, regardless of the employee's race or whether the employee has filed a charge of discrimination against the company. Indeed, MacDonald states that on at least 7 other occasions she assessed unexcused absences to employees

other than Wilson who submitted a doctor's note after their first day back at work, and this has been TecStar's policy since at least May 2000. (MacDonald Supplemental Aff. ¶ 4.) Additionally, from September 1999 to May 2005, TecStar terminated 8 other machine operators, including Brown and Uhlenkamp, for violations of TecStar's attendance policy. (MacDonald Aff. Ex. G.)

In conclusion, Wilson's claims of intentional discrimination and retaliation fail at the prima facie level. Specifically, viewing the facts in the light most favorable to Wilson, Wilson has not established that she suffered a material difference in her terms of employment when the backup duties were assigned to Brown. The additional duties did not effect an employee's pay, benefits, title, or level of authority, and Wilson's claim that the additional duties would have improved her prospects for a promotion is based on conjecture. Furthermore, Wilson has not established that she was better qualified to perform the backup duties than Brown, and TecStar demonstrated a legitimate, non-invidious reason for assigning the backup duties to Brown: Brown had more relevant experience. Finally, Wilson has not demonstrated that her race or her filing of the discrimination complaint prompted any difference in treatment or led to her termination, and TecStar demonstrated a legitimate, non-invidious reason for terminating Wilson: Wilson violated TecStar's attendance policy. Because the record would not permit a reasonable jury to conclude that Wilson suffered an adverse employment action when the backup duties were assigned to Brown, or that TecStar retaliated against Wilson for filing the discrimination complaint, the court is obliged to grant TecStar's motion for summary judgment.

Accordingly,

-19-

Case 2:04-cv-00233-JPS    Filed 01/23/07    Page 19 of 20    Document 50

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket #35) be and the same is hereby **GRANTED** and this action be and the same is hereby **DISMISSED** with prejudice, together with costs as taxed by the clerk of the court.

The clerk of the court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of January, 2007.

BY THE COURT:

s/J. P. Stadtmueller
J. P. STADTMUELLER
U.S. District Judge